Filed 6/30/21  Estate of Neth CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| Estate of DORENE NETH, Deceased. | |
| LAUREL GAIL NETH, Petitioner and Appellant, v. LESLIE M. BYRNE, Respondent. | A159314 (Alameda County Super. Ct. No. RP16814353) |

Laurel Gail Neth, the stepdaughter of decedent Dorene Neth, petitioned to invalidate a transfer of assets that Dorene made from a subtrust of the Neth Living Trust (the NLT), which was a trust created by Dorene and her late husband, to the Dorene Neth Trust (DNT), a trust Dorene created after her husband's death.  Petitioner is an income beneficiary of the NLT, and she became the NLT's trustee after Dorene's death.  Petitioner argued that Dorene did not have sufficient mental capacity to transfer assets from the NLT's subtrust to the DNT, and further contended the transfer was the product of undue influence. After a multiple-day bench trial, the trial court entered judgment in favor of respondent, a court-appointed successor trustee to the DNT.

Petitioner seeks reversal of the judgment, arguing that the trial court erred by:  (1) applying the incorrect legal standard to assess

1

Dorene's mental capacity; (2) finding that the common law presumption of undue influence did not arise; and (3) finding that petitioner had not established undue influence by clear and convincing evidence. Petitioner also argues that Dorene did not properly exercise her right to withdraw assets from the NLT subtrust and that the trial court's exclusion of witness testimony constitutes reversible error. We affirm.

## I. BACKGROUND

### A. Creation of the Trusts and the Deaths of the Trustmakers

Dorene was Clifford Neth's second wife, and Clifford was the only person for whom Dorene harbored unalloyed affection. During their marriage, Clifford and Dorene acquired a family home and several income properties in Alameda. The properties were well-maintained and a source of pride.

In 1992, Clifford and Dorene created the NLT and funded the trust principally with their real properties. The NLT provided that, upon the death of one of them, the survivor would create three subtrusts. One subtrust, the Family Trust, would consist of the portion of the separate property and the community property share of the deceased spouse that would qualify for an estate tax exemption. Another subtrust, Marital Trust (Share One), would consist of the separate property and the community property share of the surviving spouse. The third subtrust, Marital Trust (Share Two), would consist of that portion of the remainder of the deceased spouse's separate and community property that did not qualify for an estate tax exemption. The surviving spouse was entitled to the income from the various subtrusts and could otherwise dispose of the principal of Share One; the surviving spouse's access to the principal of the Family Trust and

2

Share Two was as necessary for general support. Upon the death of the surviving spouse, the property remaining in the subtrusts would continue to be held in trust with petitioner as the income beneficiary. Upon petitioner's death, the property would pass to her descendants.

Dorene failed to allocate the trust property among the subtrusts after Clifford passed away. In 2013, she sought the help of a lawyer to create a new trust with her assets. Heather Reynolds was one of several lawyers recommended to Dorene. Reynolds met with Dorene and told Dorene that Dorene first had to do the subtrust allocation.

Over the course of several weeks, Reynolds corresponded with Karen Finch, Dorene's friend, tenant, and bookkeeper, to obtain necessary information for the proper allocation and creation of the DNT. Dorene signed documents executing the subtrust allocation and creating a new trust, the DNT, on August 13, 2013. The DNT was a revocable living trust of which Dorene was the initial trustee and Finch was the successor trustee. The new trust was funded with Dorene's assets from Share One and called for the distribution, upon Dorene's death, of the trust residue to "one or more charitable organizations or foundations for the benefit of animals created or chosen in the sole and absolute discretion of the trustee." The same day she created the DNT, Dorene signed an advanced health directive, an approval of the subtrust allocation, and a form withdrawing the assets from Share One. On or around August 13, 2013, Dorene also changed beneficiary designations on her retirement accounts, designating the Friends of the Alameda Animal Shelter and the Ohlone Humane Society as the beneficiaries on some, and on annuities, apparently changing the beneficiary on at least two from the NLT to the DNT.

After Clifford's death in May 2002, Dorene cut a colorful figure on the streets of Alameda. She took great pride in her appearance, dressing well and remaining fit. She walked a great deal, dropped into various businesses to see acquaintances, and frequented garage sales. She was a gossip and something of a busybody, but she was remembered fondly as an eccentric local personality. She was blunt in her assessments of others and not reticent to share those assessments. The trial court found that the evidence showed a feisty, strong-willed, independent woman. The trial court also found that, over time, these same characteristics isolated Dorene from family members, including petitioner. Dorene spent her last years relying on the assistance of nonrelatives, including Finch. In the end, Dorene's "implacable independence" made it difficult for even these individuals to assist her or, in many cases, even to be aware of her need for assistance. Consequently, she died alone in a squalid home that had once been a showplace.

Finch assumed the trusteeship of the DNT after Dorene's death in May 2015. At the time of Finch's death in March 2016, neither woman had created or chosen a charitable organization or foundation for the benefit of animals to receive the trust residue.[1]

### B. Petitioner's Lawsuit and Trial

As is relevant here, petitioner filed a petition challenging Dorene's withdrawal of assets from Share One, the changes in

---

[1] Finch appointed Malik AboRashid, who was a neighbor of Dorene and of Finch, as successor trustee to the DNT; the trial court nullified that appointment because the DNT did not give Finch the power to appoint her successor. The court instead appointed respondent as trustee of the DNT.

beneficiary designations, and the creation of the DNT on the basis of incapacity, undue influence, and fraud. The court held a fourteen-day bench trial.

## 1. Petitioner's Evidence

Petitioner testified that she and her mother moved to Alameda when she was in sixth grade and lived on the same block as her father and stepmother, Dorene. Petitioner left California in 1979; thereafter, she saw her father three times when he visited her in Florida, and she saw Dorene twice when Dorene visited Florida. After her father's death, Finch and Dorene became friends. Petitioner maintained contact with Dorene by phone until 2013. After that, petitioner tried to email Dorene, but did not get any response. Thereafter, petitioner did not remember trying to call Dorene.

In 2011, Dorene told petitioner that she had a boyfriend named Michael Monahan who was her arborist. Dorene said that Monahan was madly in love with her and he would stay at night in her house, guarding her with a gun. That same year, Dorene similarly told petitioner that her primary care physician loved her.

In August 2013, petitioner received a letter from attorney Heather Reynolds informing her that Dorene had made changes with her share of the NLT assets. Petitioner called Dorene, and Dorene told her to talk to Finch about the details and handed Finch the phone. Petitioner conceded that it was reasonable and not surprising for Dorene to give her money to animals.

 Petitioner came to California after Dorene's death and saw that Dorene had been living in squalor. Petitioner described Dorene as habitually clean with a beautiful home, but after her death, a company

5

had to be hired to clean the house in hazmat suits. Petitioner also testified that she took pictures of what she believed to be a decomposed cat in Dorene's home.[2]

Patricia Bird, petitioner's daughter, testified that she last spoke to Dorene in 2008, and Dorene told her that she believed Clifford had come back to her in the form of a cat.

Ramon Zaragoza, who worked for Dorene as her gardener beginning in 2012, testified that he went inside Dorene's house once, and it smelled like garbage; however, he did not remember when this happened, and he testified that it may have been in 2014 or 2013. After Dorene's death, Zaragoza helped clean up her house. Approximately 300 bags of garbage were removed from Dorene's home.

Around March 2015, Finch asked Dorene's neighbor and tenant, Maria Sota, to check on Dorene because Finch was ill with cancer and was having trouble walking. Seeing the filth that Dorene was living in, Sota was mortified. The couch Dorene had been laying on was full of urine and contained a big burn mark. There was trash as high as the couch. Sota began furiously trying to clean.

Before this, Sota had been in Dorene's house once when Clifford was alive, and what she saw of the house was in good shape. In the year before Dorene's death, Sota drove Dorene to garage sales and went into her house a couple times to carry books in and put them inside the door. On those occasions, Sota saw newspapers stacked high and cigarette butts at the top of the staircase. It smelled like urine and

---

[2] As evidence of Finch's state of mind but not for the truth of the matter, the court allowed petitioner to testify that, when Finch and petitioner walked through Dorene's house after Dorene's death, Finch told petitioner there was a dead cat in the house.

6

cigarettes.  When Sota mentioned this to Finch, Finch said Dorene's house was fine.  Sota testified she first noticed a change in Dorene's hygiene in the three years before she passed, but the change in the last year was significant.  Sota also testified that, for about a year prior to her death, Dorene was leaving on Sota's doorstep things that Dorene found in the neighborhood, like "stuffed animals with eyes missing, dirty sweatshirts and blankets from the hospital and dolls with eyes missing and dirty."  Finch never expressed concerns about Dorene, but she gave Sota Dorene's credit card to purchase cleaning supplies.

After Dorene died, Sota found a cat's eyeball in a tin in Dorene's kitchen.  She testified that she thought Dorene's cat had died three or four years before Dorene passed away, but Sota did not know what happened to the cat's body.

Sota testified that Dorene said mean things about petitioner and said she did not like petitioner.  On cross-examination, Sota conceded that Dorene mentioned at one point that she wanted to give her money to an animal shelter.  In Sota's experience, Dorene never seemed confused, she always seemed to know where she was, she did not forget important details, and she did not have delusions.  Sota did not believe that Finch was abusing or taking advantage of Dorene.  Sota testified that Dorene had given her money in the past, and Dorene told her that she had given Michael Monahan money to fix his truck and buy tires.

Dr. Teresa Thomas was hired as an expert and developed her opinions from review of Dorene's medical records.  Dr. Thomas testified to notable medical records from May and June 2011 wherein Finch and two doctors noted that Dorene had potential cognitive and memory impairments.  In December 2013, Dorene's physician performed a

7

cognitive screen and noted moderate impairment. Dr. Thomas opined that Dorene's behaviors were consistent with cognitive impairment and mild dementia. She opined that Dorene lacked contractual and testamentary capacity and was susceptible to undue influence in 2013.

Handwriting expert Patricia Fisher reviewed exemplars of Dorene's handwriting over the years, including the NLT trust documents, bank records, and a check book with blank checks that Dorene had signed. She opined that Dorene's signature deteriorated from 2010 to 2012. While she believed that Dorene signed the blank checks at the same time or close in time, Fisher could not say when this happened.

In June 2011, Fisher opined that Finch began recording data for paid checks and filling out checks for Dorene's signature. Fisher testified it was very common to see someone come in and start helping out with bookkeeping for a person as he or she gets older. Fisher further testified that Finch filled out some of the checks Fisher reviewed, and two checks to Finch were not signed by Dorene.

Regarding Monahan, Fisher testified there were a number of checks to him that were filled out and/or signed by someone other than Dorene. In particular, Dorene did not sign twelve checks to Monahan. Fisher did not have an exemplar of Monahan's printing or signature, but she assumed that the endorsements on checks made out to him where signed by him. Checks to Monahan appeared from 2009 to 2012. In 2010 and 2011, checks to Monahan totaled approximately $19,000, and, in 2012, checks to him totaled approximately $47,000. Fisher had exemplars of Finch's handwriting and printing, and she did not believe that Finch wrote or signed any of the checks to Monahan.

## 2. Respondent's Evidence

Attorney Heather Reynolds testified that she had drafted well over a thousand trusts. Finch contacted her on Dorene's behalf about Dorene's desire to set up a charitable trust. Reynolds did not personally know Dorene until their first meeting, but she knew of her for about five years. Dorene was a figure in the community, and Reynolds had bumped into her around Alameda; she did not observe any differences in Dorene between when she first began bumping into her and their in-person meeting.

Reynolds had two meetings with Dorene. The first was over an hour, but likely less than three hours. Reynolds usually met with clients two times when drafting their wills and trusts. Dorene's appearance was very polished; she wore jewelry, makeup, and cared about her hair. She also appeared very healthy, and Reynolds would often see her walking around town. Dorene communicated to Reynolds that she wanted to give her money to a charity of some kind to benefit animals, she was particularly fond of cats, and she was interested in something with her name on it. Given the complications and tax issues associated with charitable trusts and foundations, Reynolds recommended that Dorene visit an attorney who specialized in that area. Reynolds, however, generally walked Dorene through charitable options, and she testified that Dorene eventually seemed inclined to give her money to an existing charity because that involved less paperwork.

At the first meeting, after reviewing the NLT documents, Reynolds informed Dorene that she needed to do the subtrust allocation. Dorene hired Reynolds to do the allocation and to create a

new trust for Dorene in the meantime, while Dorene considered whether to create a charity. To accommodate Dorene's wishes to use her assets, Reynolds suggested that Dorene withdraw her assets from the NLT. Dorene informed Reynolds that she did not want to leave her assets to petitioner. Dorene told Reynolds about her assets, and she gave an accurate description thereof. Reynolds testified that Dorene "absolutely" appeared to understand her questions. Dorene expressed that she wanted the assets of the Family Trust and Share Two to be real estate to the extent possible because Clifford had wished to leave that to his descendants.

Reynolds testified that her practice was to ask questions to get to know her clients for about 30 minutes during her first meeting with the client to assess capacity. If she had any doubts about capacity, she used a capacity questionnaire and, from there, referred clients to a psychiatrist if necessary. She testified that she had no question that Dorene had capacity upon their meeting, and it was not even a close call. At some point, Dorene could not remember which branch she had a safety deposit box at with property deeds, but this did not concern Reynolds because it was common for clients to forget such details. Finch was present at the first meeting to answer questions about bank account numbers, but she was very quiet and did not speak unless spoken to. Dorene wanted Reynolds to work with Finch to get the bank account numbers and asset details, and she wanted her to work with her certified public accountant (CPA), Kevin Kearny. Reynolds testified that it was obvious Dorene wanted to be in control of her assets, but she did not want to handle the details of the information exchange. She also testified that it was not difficult to get Dorene's

wishes out of her. Finch did not do anything to make Reynolds suspicious that Finch was influencing Dorene, and Finch sometimes took smoke breaks during which Reynolds and Dorene would carry on.

Between the first and second meeting, Reynolds corresponded with Finch to get practical details regarding Dorene's finances, and she worked with Kevin Kearny to effect the subtrust allocation.

At their second meeting, Dorene again appeared very polished. Reynolds went over all the documents she prepared for Dorene, and it appeared to her that Dorene understood them. Reynolds testified that the DNT clause allowing the trustee to choose the charitable entity that would receive Dorene's assets was Reynolds's idea. This was intended to be temporary because Dorene thought she wanted two specific charities, but she was on the "fritz" at the time with one or both and was not willing to commit.

Kevin Kearny was Dorene's CPA since about 2005 or 2006, and he prepared two tax returns for her per year. He saw her four or five times a year with business meetings and her casual drop-ins. He also ran into her around town sometimes. Dorene appeared to have a good grasp on what the two discussed when they met to address her tax returns. She took care with her appearance, she flirted some, and she loved cats. Dorene volunteered to him that she wanted to leave her assets to a charity to benefit cats, although Kearny could not remember exactly when she said this. He recommended that she go to an attorney to set up a proper trust, and he gave her three names, including Heather Reynolds. It did not seem to Kearny like Dorene was being pressured to set up a charitable trust, and she seemed fully in control of her decisionmaking. Dorene asked him questions about the new

11

trust and the asset allocation for the subtrusts, and she appeared to understand the import of the new trust. Kearny testified that he observed Finch and Dorene together, and they seemed like friends. He never received financial information regarding Dorene that made him think that someone was taking advantage of her. Finally, Kearny testified that, in the time he knew Dorene, he had no concerns about her mental state.

Dorene's investment manager, Gregory Schmidt, knew Dorene for around 20 years and saw her once or twice a year. By the end of their relationship, he managed a couple million dollars of investments for Dorene. He never had the impression that Dorene did not understand her assets, and she always appeared healthy and well groomed. She never appeared confused or forgetful, and he had no concerns about her mental state or ability to manage her finances. Schmidt testified that Dorene discussed giving her assets to the benefit of cats in the years before she created the new trust in 2013, and, when she created her new trust, Dorene told him they had taken care of what she had been talking about for years. On cross-examination, Schmidt testified that signing a book of blank checks was something Dorene would never do.

Schmidt's assistant, Richelle Wilkerson, who also knew Dorene for many years, testified that Dorene seemed to have a good grasp on her assets, she never perceived a reason to be worried about Dorene's mental state, and Dorene had mentioned giving her money to an animal charity many times. Wilkerson also testified that Dorene did not want petitioner to be a beneficiary of her accounts, and Dorene made it clear that she did not like petitioner.

Respondent also called Dr. Teo Ernst. Dr. Ernst reviewed Dorene's medical records and some deposition testimony from the case. He observed that there was some evidence that Dorene had cognitive difficulties in 2011 in her medical records, but he opined that these difficulties were the result of the large amount of opiate-based prescriptions Dorene was taking at the time. He considered dementia, but that was inconsistent with her resumed regular cognitive function by December 2011 when she stopped taking the opiates. Dr. Teo also observed an indication of cognitive decline in December 2013 in records from Dorene's treating physician, but he did not give this great weight because it was not clear from the records what test the physician had used to reach his conclusion. Dr. Teo opined that Dorene had capacity under Probate Code sections 6100.5, 811, and 812 in August 2013, and she was not vulnerable to undue influence.

## 3. The Statement of Decision

After overruling petitioner's objections to the proposed statement of decision, the court issued a final statement of decision and judgment. The court first addressed a standing concern, and found that, as successor trustee of the NLT and its subtrusts, petitioner had standing to seek to nullify Dorene's withdrawal of assets from Share One. However, the court determined that if those funds were withdrawn without undue influence, fraud, or incapacity, petitioner did not have

standing to separately challenge the creation of the DNT.[3]  The court went on to find that Dorene had capacity to withdraw the assets and to use them to fund the DNT, as well as to create the DNT.  The court further found that petitioner failed to raise a presumption of undue influence, and she failed to establish the acts at issue were the product of undue influence.[4]

Petitioner appeals.

## II.  DISCUSSION

### A. Mental Capacity

#### 1. Statement of Decision

The trial court began its analysis by citing what it deemed the "relevant sections" of the Probate Code[5], sections 800 to 812, and *Andersen v. Hunt* (2011) 196 Cal.App.4th 722 (*Andersen*).  It observed

---

[3] In a section of her brief dedicated to challenging the trial court's ruling on Dorene's capacity, petitioner asserts that she has standing to contest the DNT.  Any challenge that petitioner could have brought to the trial court's standing ruling is forfeited as improperly presented. (*Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 201 [failure to comply with rule requiring that each argument be presented under a separate heading forfeits the argument].) Ultimately, the trial court's ruling that petitioner lacked standing to challenge the creation of the DNT is immaterial, given petitioner's argument that she has standing to seek return of the assets taken from Share One and the trial court's agreement that petitioner had standing to do so.

[4] We set forth the court's analysis on the issues of capacity and undue influence in greater detail when addressing petitioner's arguments regarding those issues.  The trial court also rejected a fraud-based challenge to the acts at issue, but that aspect of the court's ruling is not challenged on appeal.

[5] All further statutory references are to the Probate Code unless otherwise indicated.

14

that sections 810 to 812 " 'do not set out a single standard for contractual capacity, but rather provide that capacity to do a variety of acts, including to contract, make a will, or execute a trust, must be evaluated by a person's ability to appreciate the consequences *of the particular act he or she wishes to take*. More complicated decisions and transactions thus would appear to require greater mental function; less complicated decisions and transactions would appear to require less mental function.' "

Finding that, per *Andersen*, capacity should be assessed "in relationship to the particular act in question," the court embarked upon assessments of the acts at issue. It noted that petitioner had not challenged Dorene's capacity to execute the subtrust allocation in this action.[6] Regarding the withdrawal of assets from Share One, the court found that the "requisite level of capacity here must be assessed in light of [Dorene's] right to dispose of these assets as she saw fit. That is to say, no particularly high level of sophistication would be necessary to appreciate the import of this action." The court acknowledged that the withdrawal had consequences for petitioner and her heirs, but found those consequences "were not meaningfully different from the consequences following on the creation of a will." The court also found that the terms of the DNT were quite simple. The court concluded,

---

[6] The trial court correctly stated that petitioner did not request to set aside the subtrust allocation for alleged lack of capacity. Petitioner informs us that she filed a separate action claiming that Dorene breached her fiduciary duties as trustee of the NLT by taking NLT assets, converting them to annuities in Dorene's name, and then later changing the beneficiary on the annuities to the DNT. From what petitioner has represented, that separate action does not appear to challenge Dorene's capacity to make the subtrust allocation.

15

"The requisite standard of capacity applicable to [Dorene's] withdrawal of Share One assets and, if [petitioner] did have standing, the creation of the [DNT] is the testamentary capacity outlined in [ ] section 6100.5(a)(1)."

Next, the court acknowledged the rebuttable presumption in section 810 that all persons have capacity to make decisions and to be responsible for their acts. The court observed that the question before it was Dorene's capacity in August 2013, and, while evidence before or after that date may be circumstantially relevant, it was not controlling. The court determined that petitioner failed to contravene section 810's presumption of capacity. The contradictory opinions from the parties' medical experts regarding Dorene's capacity were in equipoise, with "neither more convincing than the other." The court further found that "[p]etitioner presented evidence of eccentricities or even questionable practices of [Dorene], but they simply do not amount to a preponderance of evidence of any level of incompetency at the relevant time." The court acknowledged that Reynolds was an experienced trust lawyer attuned to the issue of capacity, and it found her testimony on capacity compelling. Reynolds's description of Dorene was consistent with those who had known Dorene for years and suggested a woman who still possessed her stubborn independence and mental acuity.

Finally, the court acknowledged Civil Code sections 38 and 39, which govern the capacity to enter into a contract or other conveyance, and noted petitioner's attempt to raise the "rebuttable presumption affecting the burden of proof that a person is of unsound mind . . . if the person is substantially unable to manage his or her own financial resources or resist fraud or undue influence." While stating that the

16

interplay between those statutes and sections 810 through 812 was "not entirely clear," the court nonetheless found "there [was] insufficient evidence to establish the rebuttable presumption found in section 39. It cannot be said that, as of August 2013, [Dorene] was substantially unable to manage her financial resources or to resist fraud or undue influence. [¶] On the whole, petitioner has failed to carry her burden to demonstrate a lack of capacity at the relevant time."

## 2. Testamentary and Contractual Capacity

Testamentary capacity requires "only that the person understand the nature of the testamentary act, the nature of the property at issue, and his or her relationship to those affected by the will, including parents, spouse, and descendants." (*Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1351 (*Lintz*); § 6100.5, subd. (a).) " ' "It is thoroughly established by a series of decisions that: 'Ability to transact important business, or even ordinary business, is not the legal standard of testamentary capacity.' " ' " (*Andersen*, *supra*, 196 Cal.App.4th at p. 727.)

By contrast, there is no single standard of what the law refers to as contractual capacity (§§ 810–812) to take certain legal acts, although contractual capacity is recognized as requiring greater mental acuity than that required to make a will. (*Lintz*, *supra*, 222 Cal.App.4th at pp. 1351–1352.) Section 810 establishes a rebuttable presumption "that all persons have the capacity to make decisions and to be responsible for their acts or decisions," recognizing that those with mental or physical disorders "may still be capable of contracting, conveying, marrying, making medical decisions, executing wills or trusts, and performing other actions." (§ 810, subds. (a), (b).) Section 811, subdivision (a),

17

provides that a person lacks capacity when there is a deficit in at least one of the listed mental functions and "a correlation [exists] between the deficit or deficits and the decision or acts in question . . . ." The statute organizes the mental functions into four categories: (1) alertness and attention (§ 811, subd. (a)(1)); (2) information processing (§ 811, subd. (a)(2)); (3) thought processes (§ 811, subd. (a)(3)); and (4) ability to modulate mood and affect (§ 811, subd. (a)(4)). A deficit in one of the listed mental functions "may be considered only if the deficit, by itself or in combination with one or more other mental function deficits, significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question." (§ 811, subd. (b).) Under section 812, "Except where otherwise provided by law, including, but not limited to . . . the statutory and decisional law of testamentary capacity, a person lacks the capacity to make a decision unless the person has the ability to communicate verbally, or by any other means, the decision, and to understand and appreciate, to the extent relevant all of the following: [¶] (a) The rights, duties, and responsibilities created by, or affected by the decision[;] [¶] (b) The probable consequences for the decisionmaker and, where appropriate, the persons affected by the decision[; and] [¶] (c) The significant risks, benefits, and reasonable alternatives involved in the decision." (§ 812.)

Taken together, sections 810 through 812 define what courts have described as a "sliding-scale" standard for contractual capacity. (*Lintz*, *supra*, 222 Cal.App.4th at p. 1352.) The capacity "to do a variety of acts, including to contract, make a will, or execute a trust, must be evaluated by a person's ability to appreciate the consequences of the

18

particular act he or she wishes to take. More complicated decisions and transactions thus would appear to require greater mental function; less complicated decisions and transactions would appear to require less mental function." (*Andersen*, *supra*, 196 Cal.App.4th at p. 730.)

In the context of trust instruments, one side of the sliding scale lines up with testamentary capacity. In *Andersen*, where the issue was whether a testator had capacity to execute amendments to her trust that changed the beneficiary allocations, the court held that "while section 6100.5 is not directly applicable to determine competency to make or amend a trust, it is made applicable through section 811 to trusts or trust amendments that are analogous to wills or codicils." (*Andersen*, *supra*, 196 Cal.App.4th at p. 731.) Because the contested trust amendments did no "more than provide the percentages of the trust estate [the trustor] wished each beneficiary to receive," the "simplicity and testamentary nature" of these amendments made them "indistinguishable from a will or codicil" and the trustor's "capacity to execute the amendments should have been evaluated pursuant to the standard of testamentary capacity articulated in section 6100.5." (*Ibid.*)

Subsequently, the court in *Lintz* accepted *Andersen*'s reasoning that the testamentary capacity standard reflected in section 6100.5 applies to simple trust amendments through section 811, but concluded that standard did not apply to the more complex trust instruments before it. (*Lintz*, *supra*, 222 Cal.App.4th at pp. 1352–1353.) The challenged instruments in *Lintz* included a number of trust amendments that ultimately resulted in the enactment of a new living trust declaring all of the decedent's property to be community property,

19

and giving his surviving spouse an exclusive life interest in his estate, the right to disinherit his youngest child, and the right to leave unspent residue to the surviving spouse's children. (*Id.* at p. 1350.) Because the living trust "addressed community property concerns, provided for income distribution during the life of the surviving spouse, and provided for the creation of multiple trusts, one contemplating estate tax consequences, upon the death of the surviving spouse" (*id.* at p. 1353), the court held that the instruments at issue were "unquestionably more complex than a will or codicil" and therefore required more than testamentary capacity. (*Id.* at pp. 1352–1353.)

### 3. Analysis

Petitioner contends that trial court erred in selecting the testamentary capacity standard (§ 6100.5) when it should have selected what she claims is the higher standard more broadly applicable to making decisions and entering contracts in sections 810 to 812. She offers two arguments in support of this theory: 1) everything that Dorene did on or around August 13, 2013—including the subtrust asset allocation, withdrawal of assets from Share One, creation of the DNT, funding of the DNT, and changes in beneficiaries on annuities and retirement accounts—was a single, complex "global act"; and 2) even if the acts of (a) withdrawing the assets from Share One and transferring them to the DNT, and (b) creating the DNT should be viewed separately, they required contractual capacity. We disagree that any alleged error requires reversal here. Although the trial court stated that the lack of complexity of the acts at issue warranted the application of section 6100.5's testamentary capacity standard, review of the statement of decision demonstrates that the court rendered its

20

ultimate conclusion on capacity considering a higher sliding-scale, or contractual capacity, standard as well.

In the statement of decision, the trial court recognized that the "relevant" statutes, sections 810 through 812, do not set out a single standard for capacity. In analyzing the capacity needed to take the acts at issue, the trial court used the term "level of capacity" or "level of mental function" interchangeably with the term "standard of capacity." Then, in its analysis, the court found that petitioner failed to contravene section 810's presumption of capacity. It determined that the medical experts' opinions were in equipoise, and it found that "[p]etitioner presented evidence of eccentricities or even questionable practices of [Dorene], but they simply do not amount to a preponderance of evidence *of any level of incompetency at the relevant time*." (Italics added.) Finally, the court recognized that petitioner sought to invoke the standard of contractual capacity from Civil Code sections 38 and 39[7], but it rejected this effort, finding that petitioner failed to raise the Civil Code section 39, subdivision (b) presumption that a person is of unsound mind, and concluding: "On the whole,

_____

[7] Civil Code section 38 provides, "A person entirely without understanding has no power to make a contract of any kind, but the person is liable for the reasonable value of things furnished to the person necessary for the support of the person or the person's family."

Civil Code section 39 provides, "(a) A conveyance or other contract of a person of unsound mind, but not entirely without understanding, made before the incapacity of the person has been judicially determined, is subject to rescission . . . . [¶] (b) A rebuttable presumption affecting the burden of proof that a person is of unsound mind shall exist for purposes of this section if the person is substantially unable to manage his or her own financial resources or resist fraud or undue influence. Substantial inability may not be proved solely by isolated incidents of negligence or improvidence."

21

petitioner has failed to carry her burden to demonstrate a lack of capacity at the relevant time." Thus, while the trial court stated that testamentary capacity was the appropriate standard, the text of the court's analysis shows that the court ultimately concluded that petitioner failed to satisfy her burden even if a higher standard of competency applied.[8]

## B. *Undue Influence*

With respect to her contention that Finch unduly influenced Dorene to withdraw assets from Share One and use those assets to fund the DNT, petitioner argues: (1) the trial court erred by failing to shift the burden of proof to respondent because the court incorrectly determined that Finch did not unduly profit; and (2) the presumption of undue influence aside, the trial court erred in finding that petitioner had not borne her burden of establishing undue influence.

### 1. Statement of Decision

On the issue of undue influence, the trial court first set forth the law governing challenges to inter vivos acts (Civil Code, § 1575; *O'Neil v. Spillane* (1975) 45 Cal.App.3d 147). Stating that the subtrust allocation and the withdrawal of assets from Share One were essentially inter vivos acts, the court found that, in August 2013, Dorene was not in poor health, she was not isolated from others, there was no evidence that any person was supplying her with the necessities of life, and Reynolds's testimony suggested that Dorene's actions were

---

[8] Petitioner filed a request for judicial notice of August 2013 grant deeds and affidavits of death by the successor trustee relating to the real properties used to fund the NLT. We deny this request as irrelevant.

of her own volition. As such, the trial court found the burden to disprove undue influence did not shift to respondent.[9]

Next, the trial court assumed that the acts at issue could be viewed as testamentary and set forth the common law undue influence standard for testamentary acts. With respect to the presumption of undue influence, the court found that a confidential relationship existed between Finch and Dorene because, in addition to being Dorene's friend, Finch was her tenant, property manager, and bookkeeper. Finch also served as the conduit between Reynolds and Dorene in 2013, and Dorene entrusted Finch to act on her behalf on financial matters. The court found that the same evidence established that Finch was actively involved in the preparation of the August 2013 documents.

However, the court found no undue profit accruing to Finch. It focused on whether Finch unduly influenced Dorene in August 2013 and made the following observations: the assets were earmarked for the care of animals, one of Dorene's longtime passions; when the DNT was created, Dorene, as trustee, retained the power to designate a

_____

[9] Petitioner does not argue that this aspect of the trial court's ruling was in error. Indeed, she does not mention this part of the trial court's ruling or Civil Code section 1575 in her opening brief. If she intended to make any such argument, she failed to preserve it. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [an issue in an appellate brief must be supported by reasoned argument and citations to authority or else it is forfeited].) Thus, to the extent that the withdrawal of assets from Share One was an inter vivos act, the trial court's ruling that it was not the product of undue influence stands unchallenged. To the extent the act can be considered a testamentary act in conjunction with the DNT's testamentary provisions, petitioner's challenge fails for the reasons set forth *post*.

charity as her beneficiary; Reynolds's testimony clearly established that the provision at issue was put in place only temporarily to allow Dorene more time to decide whether she would create a foundation or give the assets to an existing charity; and, that Dorene would die without choosing a beneficiary could not have been known in August 2013. The court questioned, "If Finch intended in August 2013 to create a charitable trust with herself as trustee, why not simply do so at the time, or, at least, create one with herself as successor to [Dorene]?" The court thus found any benefit to Finch to be "tenuous," "negligible," and "so largely in keeping with [Dorene's] own wishes that the third necessary element of the [*Estate of*] *Sarabia* analysis . . . cannot be established."[10]

Next, acknowledging that petitioner could establish undue influence by clear and convincing evidence absent the presumption, the court examined the evidence in light of the common law definition and the factors set forth in Welfare and Institutions Code section 15610.70, which supplement the common law.[11] The court's analysis was as follows: Dorene displayed some indicia of vulnerability because she was of advanced age and her cognitive function was not perfect. Nonetheless, her health was good, she was not isolated, and, as of August 2013, she continued to make social rounds. Finch had some authority vis-à-vis Dorene given her involvement in Dorene's financial

---

[10] As we shall explain, *Estate of Sarabia* (1990) 221 Cal.App.3d 599, 604–605, addresses the presumption of testamentary capacity and the concept and elements of undue influence.

[11] Both parties argued below that, in addition to the common law, Welfare and Institutions Code section 15610.70 applied to assess whether the acts at issue were a product of undue influence.

affairs, but Dorene was not reliant on Finch for life necessities. None of the bankers or accountants who worked for Dorene noticed any diminished capacity. While Finch was involved in preparation of the documents at issue, the decisions were not made in haste or secrecy, and petitioner was informed immediately. Further, when considering the changes made in light of the length and nature of Finch's relationship with Dorene, the evidence established that the changes were consistent with Dorene's desires, and her choice of Finch as successor trustee was consistent with their long-term relationship. On the other hand, petitioner's relationship with Dorene was such that petitioner was not the natural object of Dorene's bounty, and petitioner conceded there was nothing unusual about Dorene's desire to use her estate for the benefit of animals. In light of these factors, the trial court could not "conclude that [petitioner] carried her burden of establishing undue influence by clear and convincing evidence."

### 2. Standard of Review

"In general, in reviewing a judgment based upon a statement of decision following a bench trial, 'any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court's decision. [Citations.]' In a substantial evidence challenge to the judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]' [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are

25

liberally construed to support the judgment." (*Estate of Young* (2008) 160 Cal.App.4th 62, 75–76.)

Where, however, the party appealing the judgment had the burden of proof at trial, and " 'where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838 (*Dreyer's Grand Ice Cream, Inc.*); see *Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 734.)

### 3. Governing Law

"A person challenging the validity of a trust instrument on the grounds that the trustor . . . [acted] under the undue influence of another carries the heavy burden of proving such allegations." (*Doolittle v. Exchange Bank* (2015) 241 Cal.App.4th 529, 545. To qualify as undue influence under the common law, the influence must " 'destroy the testator's free agency and substitute for his own another person's will.' " (*Estate of Fritschi* (1963) 60 Cal.2d 367, 373.) " '[The] circumstances must be inconsistent with voluntary action on the part of the testator' [citation]; and '[the] mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient.' " (*Id.* at pp. 373–374.) "Undue influence, then, is the legal condemnation of a situation in which extraordinary and abnormal pressure subverts independent free will and diverts it from its natural

course in accordance with the dictates of another person." (*Estate of Sarabia, supra*, 221 Cal.App.3d at p. 605.)

Effective 2014, the Legislature provided a statutory definition of undue influence: "[E]xcessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." (Welf. & Inst. Code, § 15610.70, subd. (a).) In "determining whether a result was produced by undue influence," courts must consider: "(1) The vulnerability of the victim," "(2) The influencer's apparent authority," "(3) The actions or tactics used by the influencer," and "(4) The equity of the result." (*Ibid.*) This statutory definition applies under the Probate Code as well, where it is intended to "supplement the common law meaning of undue influence without superseding or interfering with the operation of that law." (§ 86.)

Undue influence may be established in two ways. First, the challenger, who bears the burden of establishing undue influence (§ 8252), may submit direct evidence of such influence, or circumstantial evidence " 'showing . . . a number of factors which, in combination, justify the inference' " of undue influence. (*David v. Hermann* (2005) 129 Cal.App.4th 672, 684). Second, the challenger may seek to invoke the presumption of undue influence. "[A] presumption of undue influence, shifting the burden of proof, arises upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument. [Citations.]" (*Rice v. Clark* (2002) 28 Cal.4th 89, 96–97.) "If this presumption is activated, it shifts

27

to the proponent of the will the burden of producing proof by a preponderance of evidence that the will was not procured by undue influence." (*Estate of Sarabia*, *supra*, 221 Cal.App.3d at p. 605.) The challenger must prove this presumption by a preponderance of the evidence in order to shift the burden of proof. (*Estate of Gelonese* (1974) 36 Cal.App.3d 854, 863.) "It is for the trier of fact to determine whether the presumption will apply and whether the burden of rebutting it has been satisfied." (*Estate of Sarabia*, at p. 605.)

### 4. The Presumption of Undue Influence

Petitioner contends that the judgment must be overturned because she presented evidence sufficient to raise the presumption of undue influence. Specifically, she contends that the trial court's finding that there was no undue profit accruing to Finch is not supported by substantial evidence. Respondent contends that the finding was sufficiently supported, noting that Dorene named her best friend as successor trustee of the DNT. In light of the standard of review, we reject petitioner's argument.

On the issue of undue benefit, "To determine if the beneficiary's profit is 'undue' the trier must necessarily decide what profit would be 'due.' These determinations cannot be made in an evidentiary vacuum. The trier of fact derives from the evidence introduced an appreciation of the respective relative standings of the beneficiary and the contestant to the decedent in order that the trier of fact can determine which party would be the more obvious object of the decedent's testamentary disposition. [Citations.] That evidence may include dispositional provisions in previous wills executed by the decedent [citation], or past expressions of the decedent's testamentary intentions. [Citation.] It

28

may also encompass a showing of the extent to which the proponent would benefit in the absence of the challenged will." (*Estate of Sarabia, supra*, 221 Cal.App.3d at p. 607.) We also note that "[w]hether between relatives, or between friends and relatives, numerous cases have held that a will is not unnatural where it provides for one who has had a particularly close relationship with, or cared for the testator[.]" (*Estate of Mann* (1986) 184 Cal.App.3d 593, 607.)

The question before us is whether substantial evidence supported the trial court's factual finding that Finch did not unduly profit. (*Estate of Sarabia, supra*, 221 Cal.App.3d at p. 605.) The court relied on the following: 1) the DNT assets were earmarked for the care of animals; 2) when Dorene created the DNT, she, as trustee, retained the power to designate her beneficiary; 3) the trust provision allowing the trustee to select a charity was to be temporary to allow Dorene more time to decide on a charitable beneficiary; and 4) the provision at issue kept with Dorene's desires. Later in the statement of decision, the trial court found that petitioner was not the natural object of Dorene's bounty, and the choice of Finch as a successor trustee was consistent with their long friendship. Substantial evidence supports the trial court's findings, and Reynolds further testified that the provision allowing the trustee of the DNT to select a beneficiary was Reynolds's idea. We thus uphold the court's finding that petitioner did not raise the presumption of undue influence. (See *Estate of Sarabia, supra*, 221 Cal.App.3d at pp. 607–609 [upholding jury determination that alleged influencer who shared a household with decedent did not unduly profit where challenger (decedent's brother) was not a natural

object of decedent's testamentary disposition and witnesses testified to decedent's desire to leave his assets to alleged influencer].)

## 5. Undue Influence in Absence of the Presumption

Setting aside the presumption of undue influence, the trial court found that petitioner failed to bear her burden of proof to establish by clear and convincing evidence that the acts at issue were the product of undue influence. Petitioner makes two arguments seeking reversal of this finding: 1) the trial court relied "almost exclusively" on Reynolds's testimony, but this testimony did not provide substantial evidence because Reynolds had only two meetings with Dorene; and 2) the horrible conditions of Dorene's living situation prior to her May 2015 death required the court to conclude that her August 2013 acts were the product of undue influence. We are unpersuaded by these contentions.

This is not a case where the undisputed evidence is of such weight and character to compel the conclusion that the acts at issue were the product of undue influence. (See *Dreyer's Grand Ice Cream, Inc.*, *supra*, 218 Cal.App.4th at p. 838.) The trial court acted well within its discretion to decide what weight to give Reynolds's testimony and the more remote evidence from the period leading up to Dorene's May 2015 death. Further, in stating that the trial court relied "almost exclusively" on Reynolds's testimony, petitioner ignores much of the trial court's analysis. The court found that some evidence weighed in favor of undue influence, but it determined that Dorene was in good physical health in August 2013, she frequently saw people who did not notice any diminished capacity or vulnerability in her, her 2013 acts were not done in secrecy—in fact, petitioner was informed of them

30

immediately—and the decisions were consistent with Dorene's distant relationship with petitioner, her friendship with Finch, and her desire to provide for animals. Petitioner's argument amounts to nothing more than a disagreement with the trial court's resolution of competing evidence, and her evidence does not compel a finding of undue influence.[12]

## 6. The Method Used to Withdraw the Share One Assets

Petitioner next asserts that the trial court failed to address her claim that Dorene did not properly exercise the right to withdraw assets from Share One under the NLT's terms. Specifically, she seeks an order requiring that Share One assets be returned to the NLT because: 1) Dorene did not properly exercise the right to withdraw assets from Share One in writing; and 2) as an "interested trustee" under Article Seventeen of the NLT, Dorene could only distribute principal to herself for her education, health, maintenance, and support. These contentions provide no basis for reversal.

Petitioner claims that the trial court failed to address her allegations regarding the invalidity of Dorene's method of withdrawal of the Share One assets, but she failed to raise this omission in her

---

[12] In concluding its analysis, the trial court stated that petitioner had not "carried her burden of establishing undue influence by clear and convincing evidence." The parties rely on a substantial evidence standard of review, perhaps in light of the statement of decision's final comment, wherein the court stated that the answer to the question of whether Dorene was unduly influenced was "no." If this statement is viewed as a factual finding that the acts at issue were the product of a free mind (as opposed to the court's earlier conclusion that petitioner had failed to sustain her burden of establishing undue influence), the result is the same, as the substantial evidence set forth by the court supports its finding.

31

objections to the statement of decision, and substantial evidence supports an implied finding that Dorene satisfied the requirements of the NLT.  (*State Bar of California v. Statile* (2008) 168 Cal.App.4th 650, 673 [if a party fails to bring omissions in a statement of decision's factual findings to the trial court's attention, the reviewing court will infer the court made every implied factual finding necessary to uphold its decision and review the finding for substantial evidence].)  Article Nine, section 2(b) of the NLT, governing the surviving spouse's right to withdraw principal from Share One, provides:  "Our trustee shall pay to or apply for the surviving Trustmaker's benefit such amounts from the principal of Marital Share One as the surviving Trustmaker may at any time request in writing. [¶] No limitation shall be placed on the surviving Trustmaker as to either the amount of or reason for such invasion of principal."  In a letter dated August 13, 2013 and addressed, "To Whom It May Concern," Dorene wrote "I, DORENE NETH, hereby withdraw all of the assets of the NETH LIVING MARITAL TRUST– SHARE ONE . . . ."[13]  This evidence supports Dorene's withdrawal of the Share One assets per the terms of the NLT.

As to petitioner's contention that Dorene's withdrawal rights were limited by Article Seventeen, her failure to raise this argument below constitutes forfeiture of the argument on appeal.  (*Simplon Ballpark, LLC v. Scull* (2015) 235 Cal.App.4th 660, 669–670.)

_____

[13] This writing seemingly miscites Article Four, section 1(b) as the source of the withdrawal right.  Article Four governed the administration of the NLT during the lifetime of Clifford and Dorene.  After the death of one spouse, Article Nine was to govern the administration of Share One.  Petitioner does not mention this misquotation in her opening briefing.

32

### 7. Witness Exclusion

#### a. Additional Background

In September 2017, respondent propounded special interrogatories, including special interrogatory No. 26, which asked petitioner to "[identify] each [person] who supports [your] contention in paragraph 55 of [your complaint] that [Finch] 'created a plan to take advantage of [Dorene's] lack of capacity in order to gain the trust property.'" Special interrogatory No. 71 asked petitioner to "[identify] each [person] who supports [your] contention in paragraph 61 of [your complaint] that [Finch] 'formulated a plan to take advantage of [Dorene] and receive the benefit of her assets on [Dorene's] death.'" Petitioner identified three witnesses, including Malik AboRashid, in response. In February 2018, respondent requested that petitioner supplement her special interrogatory responses, and, with the exception of her expert witness, petitioner did not identify new witnesses in her supplemental July 2018 responses.

In a September 2018 witness list, petitioner listed witnesses whose names had not been disclosed in her special interrogatory responses. Respondent moved to exclude these nine witnesses from testifying. Petitioner opposed the motion, contending that she disclosed the individuals in a February 2017 settlement letter and the witnesses' names were not responsive to the special interrogatories. At the hearing on the motion, respondent clarified that she sought the exclusion of seven undisclosed witnesses because petitioner had withdrawn two names. The trial court found that the witnesses' names were responsive, the settlement letter did not satisfy petitioner's discovery obligations, and it excluded the witnesses.

### b. Analysis

Petitioner contends that the court erred in its exclusionary ruling because: 1) she mentioned the names of the witnesses at issue in the February 2017 settlement communication; 2) the names of witnesses were not responsive to the discovery; and 3) respondent improperly noticed and served the motion in limine under local rules and the Code of Civil Procedure. We review a discovery sanction for abuse of discretion and will reverse " ' "only for arbitrary, capricious, or whimsical action." ' " (*Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, 390.) We find no abuse here.

First, the trial court did not abuse its discretion in determining that the February 2017 settlement communication failed to satisfy petitioner's discovery obligations. The settlement letter was written when respondent, who had been recently appointed trustee of the DNT, was becoming familiar with the case. In the letter, petitioner encouraged respondent to speak to individuals familiar with alleged prior incidents of elder abuse by AboRashid so that respondent would understand that he could not be trusted. Petitioner wrote the letter long before the discovery at issue, and the trial court reasonably determined that petitioner's mention of the people at issue in an early settlement communication urging respondent not to trust AboRashid did not provide notice that she would rely on them to support her case.

Next, the trial court reasonably concluded that the names of five witnesses, whom petitioner stated she would call to support her theory that Finch's contact with AboRashid showed that Finch planned to take advantage of Dorene because AboRashid had defrauded elders in the past, were responsive to the request that petitioner "[identify] each

34

[person] who supports [your] contention in paragraph 55 of [your complaint] that [Finch] 'created a plan to take advantage of [Dorene's] lack of capacity in order to gain the trust property.' " The same can be said for the two witnesses who petitioner represented would give character evidence about Finch's controlling nature, given that petitioner logically would have used such evidence to show that Finch controlled and unduly influenced Dorene.[14] Indeed, on appeal petitioner contends the excluded witnesses "were essential to [petitioner's] case in proving that Finch unduly influenced [Dorene]."

Finally, no reversible procedural error occurred. Local rule 3.35(e)(2) of the Alameda County Superior Court provides that, "[u]nless otherwise ordered by the trial judge," motions in limine should be filed three court days before the pretrial conference or three court days before trial if there is no pretrial conference. However, it also provides, "This rule does not apply to motions in limine in unlawful detainer, probate, family, and juvenile cases." (Alameda County Superior Court, Local Rule 3.35(e)(1).) The trial court specifically stated that the rule did not apply to probate cases when explaining why it rejected petitioner's procedural objection. To the extent petitioner claims reversible error from service of the motions in limine by email rather than pursuant to Code of Civil Procedure 1013,

---

[14] While respondent read special interrogatory No. 26 into the record at the hearing on the motion, a separate special interrogatory requested that petitioner, "[identify] each [person] who supports [your] contention in paragraph 19 of [your complaint] that [Finch] 'controlled' [Dorene] Neth." Respondent broadly sought to exclude responsive witnesses who had not been named in the discovery responses.

35

even assuming that statute applied[15], petitioner does not show prejudice, given that she clearly received and was able to oppose the motion at issue.[16]

### III.    DISPOSITION

The judgment is affirmed.


BROWN, J.


WE CONCUR:

POLLAK, P. J.
STREETER, J.


*Neth v. Byrne* (A159314)

---

[15] Even under civil rules, a motion in limine need not be accompanied by a notice of hearing, and the place of the filing and service of the motion are at the discretion of the trial judge. (Cal. Rules of Court, rule 3.1112(f).)

[16] Having rejected petitioner's arguments for reversal of the judgment, we need not address respondent's claim that the doctrine of laches provides a separate ground for affirmance.